UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------X
```
                                                    :
ROY DAY,                                            :
                                                    :
                          Plaintiff,                :
                                                    :
              - against -                           :
                                                    :
                                                    :
MTA NEW YORK CITY TRANSIT                            :
AUTHORITY, et al.,                                  :
                                                    :
                          Defendants.   :
                                                    :
```
-------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:    9/30/2021

17-CV-7270 (VSB)

**OPINION & ORDER**

Appearances:

Roy Day
New York, NY
*Pro se Plaintiff*

Byron Zinon Zinonos
New York City Transit Authority, Law Department
Brooklyn, NY
*Counsel for Defendants MTA New York City Transit Authority, Johnathan Doe, Ruby Robinson, Dr. Cecil Akuwumi, Robert Harley, Michelle Rivera-Vargas, and John Doe MTA Employees*

Helene Rachel Hechtkopf
Hoguet Newman Regal & Kenney, LLP
New York, NY
*Counsel for Defendant MTA New York City Transit Authority*

Robert Kenneth Drinan
NYC Transportation Authority
Brooklyn, NY
*Counsel for Defendants MTA New York City Transit Authority, Johnathan Doe, Ruby Robinson, Dr. Cecil Akuwumi, Robert Harley, and Michelle Rivera-Vargas*

Steven Mark Silverberg
Hoguet Newman Regal & Kenney, LLP
New York, NY
*Counsel for Defendants MTA New York City Transit Authority, Johnathan Doe, Ruby Robinson, Dr. Cecil Akuwumi, Robert Harley, and Michelle Rivera-Vargas*

VERNON S. BRODERICK, United States District Judge:

Pro se Plaintiff Roy Day ("Plaintiff" or "Day") brings this action against the New York City Transit Authority (the "Transit Authority"), Dr. Cecil Akiwumi, Robert Harley, Michelle Rivera-Vargas, and Jonathan Siegman (the "Individual Defendants" and, together with the Transit Authority, "Defendants"), asserting claims arising under the Rehabilitation Act of 1983 (the "Rehabilitation Act"), 29 U.S.C. §§ 701, *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290, *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101, *et seq.*  Before me is Defendants' joint motion for summary judgment on all claims.  Because Plaintiff has failed to raise any evidence that would permit a reasonable trier of fact to conclude that Defendants discriminated against him on the basis of an actual or perceived disability, Defendants' motion is GRANTED.

## I.    **Factual Background**[1]

This case arises out of Plaintiff's unsuccessful application to be appointed by the Transit Authority to the position of Train Operator.  (*See* Am. Compl. ¶ 3.)[2]  In 2009, the New York City Department of Citywide Administrative Services ("DCAS") announced an open competitive examination for the Train Operator position with the Transit Authority.[3]  (*Id.* ¶¶ 3–4; Defs.' 56.1 ¶ 37; Hechtkopf Decl. Ex. 13, Notice of Examination No. 8098.)[4]  The Notice of Examination set

---

[1] The statements of fact set forth in this section are undisputed unless noted otherwise.

[2] "Am. Compl." refers to Plaintiff's Amended Complaint, filed February 16, 2018.  (Doc. 17.)

[3] There are three types of civil service exams for competitive class positions such as the Train Operator position: open competitive examinations, promotional examinations, and qualified incumbent examinations.  (Doc. 113, Defs.' 56.1 ¶ 4); N.Y. Civ. Serv. Law § 50.  Open competitive examinations are open to anyone who satisfies the minimum qualifications for a civil service title, as set forth in the official Notice of Examination.  In contrast, promotional and qualified incumbent examinations are only open to permanent and provisional employees who satisfy the minimum qualifications for the position.  (Defs.' 56.1 ¶ 6); N.Y. Civ. Serv. Law §§ 51, 52.

[4] Defs.' 56.1" refers to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, filed November 13, 2020.  (Doc. 113.)  "Hechtkopf Decl." refers to the Declaration of Helene R. Hechtkopf in Support of Defendants' Motion for Summary Judgment, filed November 13, 2020.  (Doc. 116.)

forth requirements to be appointed, including undergoing a medical examination to determine whether the applicant could perform the essential functions of the position of Train Operator and passing a drug screening.  (Defs.' 56.1 ¶ 38; Hechtkopf Decl. Ex. 13, at 2.)  The Notice also stated, "A promotion examination for this title is being held for eligible City employees.  The names appearing on the promotion list will be considered first in filling vacancies."  (Defs.' 56.1 ¶ 39; Hechtkopf Decl. Ex. 13, at 3.)

Following each examination, DCAS releases an official list with the results of the examination.  (Defs.' 56.1 ¶ 7.)  Candidates are certified as qualified for a position based on their order of priority on these lists.  *See* Personnel Rules and Regulations of the City of New York § 4.3.2.[5]  For open competitive examinations, candidates are ranked by order of their respective examination scores.  (Defs.' 56.1 ¶ 8); Personnel Rules and Regulations of the City of New York § 4.6.1.  For promotional exams, candidates are ranked both in order of their examination scores as well as the length of their service with the public agency.  (Defs.' 56.1 ¶ 8; Hechtkopf Decl. Ex. 9, Gorman Tr. 166:5-167:25; *id.* Ex. 5, Robinson Tr. 55:8-22.)[6]  Plaintiff took and passed the exam and was identified as "#9510" on the list for the position.  (Defs.' 56.1 ¶ 41; Am. Compl. ¶ 4; Hechtkopf Decl. Ex. 15.)

In September 2015, the Transit Authority released Notice of Examination No. 6704 for a promotion into the title of Train Operator.  (Defs.' 56.1 ¶ 42; Hechtkopf Decl. Ex. 14, Notice of Examination No. 6704.)  DCAS established promotional list No. 6704 effective June 21, 2017.

---

[5] The New York City Personnel Rules and Regulations, including those addressing examination procedures and employment eligibility lists, are publicly available on the City's government website. *See* https://www1.nyc.gov/site/dcas/reports/personnel-rules-regulations-rule-4.page.  I take judicial notice of these rules and regulations for purposes of the instant motion. *See Reisner v. Stoller*, 51 F. Supp. 2d 430, 440 (S.D.N.Y. 1999) (courts "may take judicial notice of matters of public record").

[6] "Gorman Tr." refers to the transcript of the July 16, 2020 Rule 30(b)(6) deposition of Richard Gorman. (Hechtkopf Decl. Ex. 9.)  "Robinson Tr." refers to the transcript of the July 10, 2020 deposition of Ruby Robinson. (*Id.* Ex. 5.)

(Defs.' 56.1 ¶ 43; Hechtkopf Decl. Ex. 25, DCAS Determinations of Personnel Commissioner's Calendar.)  Under New York's civil service rules, the Transit Authority was first to exhaust a promotional list before hiring from an open competitive list.  (Defs.' 56.1 ¶ 90); *see* N.Y. Civ. Serv. Law § 52(1).

On August 25, 2016, Plaintiff received a letter from the Transit Authority inviting him to begin the pre-employment process for the Train Operator position.  (Defs.' 56.1 ¶ 44; Hechtkopf Decl. Ex. 15, Aug. 25, 2016 Letter.)  The letter stated that Plaintiff would receive a drug test during the visit and, if he passed, that he might "be extended a conditional offer of employment and be invited to return for a medical examination." (*Id*.)  On September 9, 2016, Plaintiff reported to the Employment Center, where he submitted his paperwork and attended an informational session about the Train Operator position with other job candidates.  (Defs.' 56.1 ¶ 45.)  After the session ended, Plaintiff gave a urine sample for drug testing.  (*Id*.)  The next entry class for Train Operators included 69 candidates from the competitive civil service list, who were given a start date of September 26, 2016.  (Defs.' 56.1 ¶ 46; Rivera-Vargas Decl. ¶ 7.)[7]  Although Plaintiff passed the urinalysis screening, Plaintiff's civil service number was not reached for that entry class of Train Operators, so he was not invited to return for the second stage of the pre-employment process at that time.  (Defs.' 56.1 ¶ 46; Rivera-Vargas Decl. ¶ 7.)

On November 29, 2016 and January 24, 2017, Plaintiff was twice again canvassed for the Train Operator position and invited to attend pre-employment processing.  (Defs.' 56.1 ¶¶ 47, 50; Hechtkopf Decl. Ex. 16, Nov. 29, 2016 Letter; *id*. Ex. 17, Jan. 24, 2017 Letter.)  On both December 9, 2016 and February 3, 2017, Plaintiff returned to the Employment Center, submitted

---

[7] "Rivera-Vargas Decl." refers to the Declaration of Michelle Rivera-Vargas in Support of Defendants' Motion for Summary Judgment, filed November 13, 2020.  (Doc. 114.)

the same paperwork he submitted on September 9, 2016, attended the mandatory informational

sessions, and retook drug tests.  (Defs.' 56.1 ¶¶ 48, 51.)  During the first of these repeat sessions,

on December 9, 2016, Plaintiff spoke to Defendant John Siegman, an MTA Senior Human

Resources Specialist.  Plaintiff informed Siegman of his frustration that he was not selected for

the September class, and asked if Siegman "could get [Plaintiff] in one of [the next] classes."

(Hechtkopf Decl. Ex. 3, Pl. Dep. Tr. 38:13-39:9.)[8]  According to Plaintiff, Siegman responded

that he would try.  (*Id*. at 39:11-12.)  As an employee of the MTA and not the New York City

Transit Authority, however, Siegman had no ability to place job applicants into an entry class.

(Defs.' 56.1 ¶ 101.)  Plaintiff's civil service number was not reached for any of the entry classes

of Train Operators starting on or before March 20, 2017, so he was not invited to return for the

second stage of the pre-employment process for those entry classes.  (*Id*. ¶¶ 49, 52; Rivera-

Vargas Decl. ¶¶ 8, 10, 12.)

On March 29, 2017, Plaintiff received an email from Employment Operations Analyst

Michelle Rivera-Vargas inviting him to attend the second phase of the pre-employment process

for the April 17, 2017 entry class.  (Defs.' 56.1 ¶ 53; Hechtkopf Decl. Ex. 18, Mar. 29, 2017

Letter.)  The letter extended Plaintiff a conditional offer of employment, subject to the

completion of a medical evaluation and review of any criminal conviction history.  (*Id.*)[9]

On March 30, 2017, Plaintiff returned to the Employment Center to complete his medical

evaluation.  (Defs.' 56.1 ¶¶ 54–55.)  As part of the process, Plaintiff was required to fill out a

---

[8] "Pl. Dep. Tr." refers to the transcript of the July 21, 2020 deposition of Roy Day.  (Hechtkopf Decl. Ex. 3.)

[9] Plaintiff testified that he did not meet Rivera-Vargas at any point during the preemployment process, but named her in his complaint because she was part of the Transit Authority's Human Resources department and might have participated in his hiring process.  (Pl. Dep. Tr. 98:11-99:5.)  Rivera-Vargas was a hiring analyst; she did not meet with applicants, and never interacted with Plaintiff in person.  (Defs.' 56.1 ¶ 98.)  Hiring analysts are not involved in and have no control over the medical evaluation aspect of pre-employee processing, (*id.* ¶ 99), have no control over the announcement and scheduling of Notices of Examination, and do not interact with DCAS, (*id.* ¶ 100).

Health Questionnaire.  (*Id.* ¶ 55.)  Plaintiff indicated in his responses that he was taking

"transplant medications," as prescribed by his physician.  (*Id.* ¶ 56; Hechtkopf Decl. Ex. 19,

Questionnaire.)  In response to the question, "Do you currently use narcotics/controlled

substances?" Plaintiff responded, "Yes."  (*Id.*)[10]  Plaintiff also indicated that he has or had kidney

problems and high blood pressure.  (*Id.*)  In response to the question, "What are your current

medical problems?" Plaintiff responded, "kidney transplant."  (*Id.*)

Plaintiff also met with OHS physician Dr. Cecil Akiwumi to discuss his responses to the

questionnaire.  (Defs.' 56.1 ¶¶ 63–64.)  Plaintiff discussed his kidney transplant and anti-

rejection medications with Dr. Akiwumi.  (*Id.* ¶ 65.)  Plaintiff denied that he was a current

narcotics/controlled substance user, contrary to his statement on the questionnaire, but advised

Dr. Akiwumi that he had previously used drugs.  (*Id.* ¶ 64.)  Dr. Akiwumi and his medical

director conferred and decided, based on Plaintiff's responses, that Plaintiff should be placed on

a medical hold until they obtained more information about Plaintiff's kidney history and his prior

drug use, to determine whether he could perform the essential functions of a Train Operator.  (*Id.*

¶¶ 66–67; *see* Hechtkopf Decl. Ex. 6, Akiwumi Dep. Tr. 118:11-20.)[11]  Specifically, Dr.

Akiwumi wanted to know whether Plaintiff's kidney function and anti-rejection medications

---

[10] Plaintiff asserts in his opposition memorandum that he "could have misinterpreted the question" and meant to indicate that he had "tried drug[s]" in the past.  (Doc. 117, Pl.'s Opp. Mem. 6.)  He states that he remembers specifying that he had tried drugs in the past on the comments field, but speculates, without any basis in the record, that the questionnaire responses "could have been altered by [an] information systems technician."  (*Id.*)  However, because Dr. Akiwumi did not subject Plaintiff to a medical hold based on current drug use, but rather based on his history of attending a drug treatment program, these allegations are not relevant to my determination of the instant motion and I do not take a position on their veracity.  (*See* Hechtkopf Decl. Ex. 6, Akiwumi Dep. Tr. 110:3-15; 132:24-133:5 (testifying that the fact that Plaintiff previously attended a drug treatment program was the "only factor" guiding Dr. Akiwumi's decision to refer Plaintiff to the Work Life Services department); *see also* Hechtkopf Decl. Ex. 22-I at 12 (Dr. Akiwumi's clinical visit comments stating, "[history of] Kidney Transplant/[End Stage Renal Disease]/ [Private Medical Doctor] letter for more medical information/Attended drug treatment program refer to [Work Life Services]"); Akiwumi Dep. Tr. 127:23-128:5 (explaining clinical visit notes).)

[11] "Akiwumi Dep. Tr." refers to the transcript of the July 24, 2020 deposition of Dr. Cecil Akiwumi.  (Hechtkopf Decl. Ex. 6.)

could interfere with his ability to perform the duties of Train Operator.  (Defs.' 56.1 ¶ 68; Akiwumi Dep. Tr. 106:15-107:21.)  Dr. Akiwumi testified that it is typical to place patients on medical hold after they reveal having a renal transplant.  (*Id*. at 107:2-5.)  Dr. Akiwumi further determined that a medical hold was appropriate because Plaintiff reported a history of using illegal narcotics.  (*Id*. at 106:18-24.)  In addition, he referred Plaintiff to MTA's Work Life Services unit so that a social worker could perform an evaluation of whether Plaintiff's report of previous drug use would affect his ability to safely operate a subway train.  (Defs.' 56.1 ¶ 71; Akiwumi Dep. Tr. 99:6-100:19.)  Dr. Akiwumi explained that he had no reason at the time to believe that Plaintiff was currently using drugs, but that referrals were protocol for any candidate that mentioned a history of drug or alcohol treatment.  (*Id*. at 110:3-5, 98:15-101:18; *see also* Hechtkopf Decl. Ex. 10, Donikyan Dep. Tr. 141:10-22 (Transit Authority's corporate designee explaining that medical holds are standard for applicants who reported previously attending a substance abuse program).)[12]

Plaintiff signed a medical notification which stated:  "If the Medical Department was unable to complete your examination for any reason, you are considered to be on '**Medical Hold**.'  You must clear this medical hold **ASAP**, and if a position is still available, you may be considered for appointment.  In the mean time [sic] **a position will not be held for you**."  (Hechtkopf Decl. Ex. 21, OHS Medical Notification (emphasis in original).)

On April 5, 2017, Robert Harley, a social worker in the Transit Authority's Work Life Services department, performed a drug and alcohol assessment based on Plaintiff's report of having previously used narcotics.  (Defs.' 56.1 ¶ 73; Hechtkopf Decl. Ex. 7, Harley Dep. Tr.

---

[12] "Donikyan Dep. Tr." refers to the transcript of the August 3, 2020 Rule 30(b)(6) deposition of Louise Ann Donikyan.  (Hechtkopf Decl. Ex. 10.)

76:24-77:7;[13] Pl. Dep. Tr. 55:23-60:24; Hechtkopf Decl. Ex. 23, Work Life Service Clinical

Assessment Notes.)  During the meeting, Plaintiff told Harley that he had not used drugs since

2013 and that his diagnosis was cocaine abuse in remission.  (*Id*.)  Plaintiff also informed Harley

of his conviction history relating to narcotics and announced that he had previously attended a

substance abuse treatment program.  (*Id*.; Defs.' 56.1 ¶ 75; Harley Dep. Tr. 80:2-82:13; Pl. Dep.

Tr. 59:9-60:24.)  Harley stated that he was unable to determine whether Plaintiff's previous

treatment programs had been effective, because he did not know what the treatment modalities

were, what services were provided, or the frequency of urinalysis screens and whether or not

they were conducted in a supervised manner.  (Defs.' 56.1 ¶ 76; Harley Dep. Tr. 81:4-83:10.)

Harley instructed Plaintiff to attend a treatment program and to obtain current clinical

documentation indicating where Plaintiff was on the spectrum of recovery.  (Defs.' 56.1 ¶ 78;

Harley Dep. Tr. 92:7-17; *see* Hechtkopf Decl. Ex. 24, Medical Hold Clearance Instruction

Sheet.)  Harley testified that he did not feel that Plaintiff's prior drug abuse treatment records

were adequate because they were not within the year.  (Harley Dep. Tr. 92:18-21.)  Harley did

not direct Plaintiff to attend any specific treatment program and did not specify how long

Plaintiff would need to stay in substance abuse treatment.  (*Id*. at 96:21-97:12; Pl. Dep. Tr.

60:17-24.)

     Plaintiff elected to attend the Center for the Underserved's treatment program in Harlem.

(Defs.' 56.1 ¶ 80; Pl. Dep. Tr. 61:19-23.)  Plaintiff took over two months to complete the

program; on June 19, 2017, the Center for the Underserved provided Plaintiff with a letter

reflecting that Plaintiff completed his course of treatment.  (Defs.' 56.1 ¶¶ 81–82; Hechtkopf

---

[13] "Harley Dep. Tr." refers to the transcript of the August 4, 2020 deposition of Robert Harley.  (Hechtkopf Decl. Ex. 7.)

Decl. Ex. 26, June 19, 2017 Letter.)

On June 26, 2017, Plaintiff submitted a letter from his nephrologist to OHS indicating Plaintiff was physically fit for duty, along with supporting medical records. (Defs.' 56.1 ¶ 84.) Dr. Akiwumi reviewed these records and found them to be sufficient proof that Plaintiff was not experiencing any renal complications that might interfere with his ability to safely perform the duties of Train Operator. (*Id*.) On June 27, 2017, Plaintiff provided the letters from the Center for the Underserved to Mr. Harley. (*Id*. ¶ 85.) On the same day, Mr. Harley directed Plaintiff to return to OHS to have the medical hold lifted. (*Id*. ¶ 86.) Harley told Plaintiff that he "looked forward to riding on [Plaintiff's] train." (Am. Compl. ¶ 42.)

Plaintiff headed straight to OHS to provide Dr. Akiwumi with the documentation from Center for the Underserved. (Defs.' 56.1 ¶ 87.) Dr. Akiwumi reviewed the paperwork and cleared Plaintiff's medical hold that same day, issuing Plaintiff a medical qualification slip. (*Id*.; Hechtkopf Decl. Ex. 28, Medical Qualification Slip.) Dr. Akiwumi testified that he was not aware that Plaintiff was not ultimately hired for the position. (Akiwumi Dep. Tr. 142:15-22.)

Plaintiff immediately brought the medical qualification slip to the front desk at the Employment Center, where, to his dismay, a front desk employee informed him that the Transit Authority was no longer hiring from the open competitive list. (Defs.' 56.1 ¶ 88; Am. Compl. ¶ 44.)[14] The Transit Authority had instead started hiring from the certified established promotional list No. 6704 that was established on June 21, 2017. (Defs.' 56.1 ¶ 89; Hechtkopf Decl. Ex. 25,

_____

[14] Plaintiff testified during his deposition, but subsequently retracted, that the front desk employee provided him with a slip from a supervisor, Defendant Ruby Robinson, during this interaction. (Pl. Dep. Tr. 97:17-98:10.) Plaintiff surmises that Robinson had a role in prolonging his medical hold, but admits that he never interacted with, let alone saw, Robinson until her deposition. (*See id.* at 96:13-18.) Robinson is a hiring analyst in the Human Resources department at the Transit Authority. (Defs.' 56.1 ¶ 97.) She mainly handles applicant paperwork and does not meet with job applicants or make any hiring decisions. (*Id*.) As stated above, hiring analysts do not have any control over the medical evaluation aspect of pre-employee processing or the announcement and scheduling of Notices of Examination. (*Id.* ¶¶ 99–100.)

DCAS Calendar.)

Pursuant to the CSL and the Personnel Rules and Regulations of the City of New York, the Transit Authority could not hire from the open competitive list until the promotional list was exhausted.  (Defs.' 56.1 ¶ 90); N.Y. Civ. Serv. Law § 52(1) ("vacancies in positions in the competitive class shall be filled, as far as practicable, by promotion from among persons holding competitive class positions in a lower grade in the department in which the vacancy exists, provided that such lower grade positions are in direct line of promotion, as determined by the state civil service department or municipal commission"); *see also* Personnel Rules and Regulations of the City of New York § 5.3.3(a).[15]  As of November 12, 2020, Promotional List No. 6704 had not been exhausted nor had it expired.  (Defs.' 56.1 ¶ 91; Rivera-Vargas Decl. ¶ 18.)  On the other hand, Open Competitive List No. 8098, on which Plaintiff was listed, expired on September 19, 2017.  (Defs.' 56.1 ¶ 93; Am. Compl. ¶ 49.)  After this date, Plaintiff was no longer eligible for consideration for the position of Train Operator, unless and until a vacancy for the position once again arose, Plaintiff took and passed a subsequent Train Operator Civil Service examination, and DCAS established a civil service list based on that examination.  (Defs.' 56.1 ¶ 94; Rivera-Vargas Decl. ¶ 17.)

As a result, Plaintiff never reached the stage of pre-employment processing where his criminal history would have been reviewed.  (Defs.' 56.1 ¶ 95; Rivera-Vargas Decl. ¶ 19.)  Plaintiff was never assigned to an entry class and he was never employed as a Train Operator.  (Defs.' 56.1 ¶ 96; Rivera-Vargas Decl. ¶ 20.)

---

[15] "Under New York's civil service rules, an individual may be appointed to a [] position from either the 'promotion eligible' list or the 'open competitive' list.  These lists are made up of individuals who have taken one of two identical qualifying examinations for the position.  The promotional test is for those already employed and in the civil service line, and the open competitive examination is for all other individuals desiring the position."  *Almendral v. N.Y. State Office of Mental Health*, 743 F.2d 963, 965 (2d Cir. 1984) (citations omitted).

## II.   **Procedural History**

Plaintiff commenced this action by filing a complaint on September 22, 2017.  (Doc. 2.)

On January 29, 2018, Defendants filed a motion to dismiss the complaint.  (Doc. 10.)  In

response, I entered an Order setting a briefing schedule for Defendants' motion to dismiss or, in

the alternative, directing Plaintiff to file an amended complaint on or before February 20, 2018.

(Doc. 15.)  On February 16, 2018, Plaintiff filed his Amended Complaint.  (Am. Compl.)

On August 22, 2018, Defendants filed a motion to dismiss the Amended Complaint.

(Docs. 33–36.)  On March 31, 2019, I granted Defendants' motion in part, dismissing (1)

Plaintiff's claims against the Individual Defendants under the Rehabilitation Act in their personal

capacities, and (2) Plaintiff's claims against the Transit Authority and the Individual Defendants

under § 1983.  (Doc. 57.)  The claims that remain are Plaintiff's (1) Rehabilitation Act claims

against the Transit Authority and (2) NYSHRL and NYCHRL claims against all Defendants.

On June 24, 2019, I referred this case to the Court's Alternative Dispute Resolution

program of mediation.  (Doc. 64.)  On October 28, 2019, Defendants informed me that

settlement of the action was not achieved and requested that a conference be scheduled to

establish a case management plan and to issue a scheduling order.  (Doc. 67.)  I accordingly

directed the parties to submit a proposed case management plan by December 2, 2019.  (Doc.

70.)  On December 6, 2019, I endorsed the parties' proposed case management plan and

scheduling order, which set a deadline for completion of all discovery by April 30, 2020.  (Doc.

79.)  On January 28, 2020, Griselda Cabrera, Marion Burke, and Vanessa Gonzalez of Milbank

LLP entered notices of limited appearance of pro bono counsel on behalf of Plaintiff for the

limited purpose of taking and defending depositions and assisting with the discovery process to

the extent necessary to prepare for depositions.  (Docs. 83–85.)  The parties subsequently sought,

and I granted, four extensions of time to complete discovery.  (*See* Docs. 88–93, 96–97.)  On

September 18, 2020, the parties appeared before me for a telephonic conference, where Plaintiff

represented that he was entitled to several outstanding discovery requests.  (*See* Doc. 105.)  I

ordered Plaintiff to submit a letter on or before October 2, 2020 detailing why he was entitled to

these requests.  (*Id.*)  Plaintiff submitted a letter on October 1, 2020, (Doc. 107), and Defendants

countered his requests on October 5, 2020, (Doc. 109).  Defendants requested that I endorse a

summary judgment briefing schedule to ensure that Plaintiff's narrowed request for supplemental

discovery would not further delay the submission of dispositive motion practice.  (Doc. 108.)  On

October 7, 2020, I granted Defendants' application and scheduled Defendants' opening briefs

due on or before November 14, 2020, Plaintiff's responses due on or before December 21, 2020,

and Defendants' replies due on or before January 7, 2021.  (Doc. 110.)

On November 13, 2020, Defendants filed the instant motion for summary judgment

seeking dismissal of Plaintiff's remaining claims, along with a notice of motion to pro se litigant

pursuant to Local Civil Rule 56.2, a statement of undisputed facts pursuant to Local Rule 56.1, as

well as the declaration of Michelle Rivera-Vargas, a memorandum of law, and the declaration of

Helene R. Hechtkopf with exhibits.  (Docs. 111–16.)  On December 16, 2020, Plaintiff filed a

memorandum in opposition to Defendants' summary judgment motion.  (Doc. 117.)  On January

21, 2021, without leave, Defendants untimely filed their reply.  (Doc. 118.)  I will not consider

Defendants' reply in determining the instant motion.

### III.   <u>Legal Standards</u>

Summary judgment is appropriate when "the parties' submissions show that there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a).

"[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and

may grant summary judgment only when no reasonable trier of fact could find in favor of the

nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and

quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the

record that could reasonably support a jury's verdict for the non-moving party," summary

judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

However, courts must exercise "an extra measure of caution" in determining whether to

grant summary judgment in employment discrimination cases "because direct evidence of

discriminatory intent is rare and such intent often must be inferred from circumstantial evidence .

. . ." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal quotation

marks and citation omitted). Nevertheless, "a plaintiff must provide more than conclusory

allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137

(2d Cir. 2008). The ultimate inquiry is "whether the evidence can reasonably support a verdict in

plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

Furthermore, pro se litigants are afforded "special solicitude" on motions for summary

judgment. *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988). Courts read the pleadings,

briefs, and opposition papers of pro se litigants "liberally and interpret them to raise the strongest

arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal

quotation marks omitted); *see also Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (stating that the

submissions of pro se litigants are "held to less stringent standards than formal pleadings drafted

by lawyers" (internal quotation marks omitted)); *Monterroso v. Sullivan & Cromwell, LLP*, 591

F. Supp. 2d 567, 577 (S.D.N.Y. 2008) ("District courts should read the pleadings of a pro se

plaintiff liberally . . . and the[] same principles apply to briefs and oppositions submitted

by pro se litigants." (internal quotation marks omitted)). However, "pro se status does not

14

exempt a party from compliance with relevant rules of procedural and substantive law."

*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (internal quotation marks

omitted); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (stating that

the obligation to read pro se pleadings liberally "does not relieve plaintiff of his duty to meet the

requirements necessary to defeat a motion for summary judgment").  "[A] pro se party's 'bald

assertion,' completely unsupported by evidence, is not sufficient to overcome a motion

for summary judgment."  *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y.

1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.   Discussion

Defendants move for summary judgment on Plaintiff's Rehabilitation Act and NYSHRL

claims on the basis that there is no evidence that would allow a reasonable trier of fact to

conclude (1) that Plaintiff was "otherwise qualified" for the position of Train Operator; or (2)

that Plaintiff was discriminated against on the basis of an actual or perceived disability.

Defendants also argue that because Plaintiff has not shown that Defendants treated him less well,

nor that they did so due to discriminatory intent, his NYCHRL claim must fail.  I disagree with

Defendants that Plaintiff has not satisfied the element of showing that he was "otherwise

qualified" for the position.  However, because I find that Plaintiff has shown no causal nexus

between discriminatory motives and the unsuccessful nature of his Train Operator application,

Defendants' motion is GRANTED.[16]

---

[16] Since I base my decision on those grounds, I need not reach the question of whether Plaintiff's approximately 12-week-long medical hold, which held up his job application, constitutes an "adverse employment action" for purposes of his disability discrimination claims.

### A.  *Local Rule 56.2*

Local Rule 56.2 requires a party moving for summary judgment against a pro se litigant to file a separate document along with their motion papers titled "Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment".  The form of the notice is contained in Local Rule 56.2 and warns the pro se litigant that his claims might be dismissed if he does not submit documents "required by Rule 56(c) of the Federal Rules of Civil Procedure and by Local Civil Rule 56.1."  Local Civil Rule 56.2.  Local Rule 56.1 requires the party moving for summary judgment to submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civil Rule 56.1(b).  This document is known as a Rule 56.1 statement.  The rule also requires, among other things, that a party opposing a motion for summary judgment submit a responsive 56.1 statement with "correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  *Id.*  The rule warns that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Civil Rule 56.1(c).

Generally, "a plaintiff['s] failure to respond or contest" facts set forth in a Rule 56.1 statement "constitutes an admission of those facts, and those facts are accepted as being undisputed."  *Preville v. Pepsico Hourly Emps. Ret. Plan*, 45 F. Supp. 3d 408, 409 n.1 (S.D.N.Y. 2014), *aff'd*, 649 F. App'x 63 (2d Cir. 2016).  Here, Plaintiff did not submit a statement opposing

Defendants' Local Rule 56.1 statement or submit any evidence along with his opposition to Defendants' summary judgment motion.  Pro se litigants advised of their Rule 56 obligations pursuant to Local Rule 56.2, as is the case here, "are . . . not excused from meeting the requirements of Local Rule 56.1."  *See Liverpool v. Davis*, 442 F. Supp. 3d 714, 723 (S.D.N.Y. 2020) (citation omitted).

"[W]here a pro se plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions."  *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009); *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted)).  Therefore, I will independently review Plaintiff's arguments as well as the record to verify that Defendants' Local Rule 56.1 statement is not refuted by the evidence before deeming the facts set forth therein admitted.

**B.** ***Rehabilitation Act, NYSHRL, and NYCHRL Claims Against the Transit Authority***

**1.  Applicable Law**

The Rehabilitation Act prohibits hiring discrimination against based on disability.  *See Vlad-Berindan v. MTA New York City Transit*, No. 14-CV-675 RJS, 2014 WL 6982929, at *10 (S.D.N.Y. Dec. 10, 2014) (citing 29 U.S.C. § 791(g)).  Specifically, the Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance .

. . ."  29 U.S.C. § 794(a).  "To establish a *prima facie* case of employment discrimination under

the Rehabilitation Act," a plaintiff must show that:  (1) he or she is an "individual with a

disability," (2) he or she was "otherwise qualified for a position," (3) he or she was "denied that

position on the basis" of his or her disability, and (4) "the employer in question receives federal

funds."  *D'Amico v. City of New York*, 132 F.3d 145, 150 (2d Cir. 1998); *see also Nadel v.

Shinseki*, 57 F. Supp. 3d 288, 295 (S.D.N.Y. 2014).

      "Claims of disability discrimination pursuant to the Rehabilitation Act are analyzed under

the same standards as claims brought under the Americans with Disabilities Act ('ADA')."  *Day

v. MTA N.Y.C. Transit Auth.*, 17-CV-7270 (VSB), 2019 WL 1437616, at *4 (S.D.N.Y. Mar. 31,

2019) (citing *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016)).  And courts

"generally apply the same standard to ADA, NYSHRL and NYCHRL claims on a motion for

summary judgment, in view of the largely coextensive scope of the ADA and NYSHRL, and the

fact that both are considered to be 'a floor below which the [NYCHRL] cannot fall.'"  *Makinen

v. City of New York*, 53 F. Supp. 3d 676, 690 (S.D.N.Y. 2014) (alteration in original); *see Atencio

v. USPS*, 198 F. Supp. 3d 340, 355 (S.D.N.Y. 2016) ("Rehabilitation Act claims generally are

analyzed using the same standards that govern ADA claims."); *Novick v. Vill. of Wappingers

Falls*, 376 F. Supp. 3d 318, 342 (S.D.N.Y. 2019) (analyzing plaintiff's ADA and NYSHRL §

296 claims in tandem).  Again, a plaintiff must show that he or she was "qualified to perform the

essential functions of the job, with or without reasonable accommodation," and that he or she

"suffered an adverse employment action because of his [or her] disability or perceived

disability."  *Id.* at 341.  Although the NYCHRL is more lenient than its state and federal

counterparts and courts must "constru[e] the NYCHRL's provisions broadly in favor of

discrimination plaintiffs," *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109

(2d Cir. 2013) (internal citations and quotation marks omitted), the same causal requirement applies, and Plaintiff "still bears the burden of showing that the conduct is caused by a discriminatory motive," *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 532 (S.D.N.Y. 2015) (internal quotation marks omitted).  That is, he "must show that [he] has been treated less well at least in part *because of* [his protected status]."  *Id*. (alterations in original) (citation omitted).

Under a "cat's paw" theory of liability, "an employer may be held liable for discrimination based on the discriminatory animus of someone who was not the ultimate decisionmaker, but who intended, by his conduct, to proximately cause the adverse employment action, and did, in fact, cause that employment decision."  *Luka v. Bard Coll*., 263 F. Supp. 3d 478, 488 (S.D.N.Y. 2017) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)).

### 2.  Application

Defendants do not dispute that the Transit Authority receives federal funds, and for the purposes of the instant motion, do not contest that Plaintiff is an individual with a disability. (Defs.' Mem. 10.)[17]  Accordingly, I need only assess the second and third elements of the *prima facie* case—that is, whether Plaintiff has shown that he was otherwise qualified for the Train Operator position, and that he was excluded from that position on the basis of his disability.

### a.  "Otherwise Qualified"

In order to show that he was "otherwise qualified" for the Train Operator position, Plaintiff must show that he was "able to perform the essential functions of the position, with or without a reasonable accommodation."  *D'Amico*, 132 F.3d at 151; *see also Gilbert v. Frank*, 949 F.2d 637, 641 (2d Cir. 1991) (defining an "otherwise qualified" individual as "one who is able to

---

[17] "Defs.' Mem." refers to Defendants' memorandum of law in support of their motion for summary judgment, filed November 13, 2020.  (Doc. 115.)

meet all of [the] program's requirements in spite of his handicap" (quoting *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 288 n.17 (1987)); *Fink v. N.Y.C. Dep't of Pers.*, 855 F. Supp. 68, 71 (S.D.N.Y. 1994), *aff'd*, 53 F.3d 565 (2d Cir. 1995); *Hogarth v. Thornburgh*, 833 F. Supp. 1077, 1086 (S.D.N.Y. 1993).

What this requires is that "an actually or regarded as disabled [p]laintiff must demonstrate that they were otherwise capable of performing the job." *Makinen*, 53 F. Supp. 3d at 693. "The determination of whether the employee is otherwise qualified as of the date of termination is based on a prospective comparison of the employee's ability to perform and the abilities of non-disabled individuals to perform." *D'Amico*, 132 F.3d at 151. A "[p]laintiff is not otherwise qualified unless he [or she] is able, with or without reasonable accommodation, to perform the essential functions of the job in question." *Stamey v. NYP Holdings, Inc.*, 358 F. Supp. 2d 317, 323 (S.D.N.Y. 2005). "'Essential functions' are duties that are 'fundamental' to the job in question." *Vandenbroek v. PSEG Power, CT LLC*, 356 Fed. App'x 457, 459 (2d Cir. 2009) (summary order) (citing *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)). In determining which duties are fundamental, a court should accord "considerable deference to an employer's judgment." *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013). "Generally speaking, however, a plaintiff can discharge their burden by demonstrating that they possess the basic skills necessary for the performance of [the] job." *Makinen*, 53 F. Supp. 3d at 694 (internal quotation marks and citation omitted) (alteration in original).

This inquiry requires consideration of "what conduct is symptomatic of the handicap, what conduct the job in question requires, and how these two interact." *D'Amico*, 132 F.3d at 151. In other words, a court should "consider both the type of position for which the plaintiff claims to be otherwise qualified, and the consequences of a potential mishap." *Id.* "[W]here

there is a history of mental or emotional problems, or of drug abuse, an employer is justified in considering the possibility of relapse even though there is evidence of cure or recovery." *D'Amico v. City of New York*, 955 F. Supp. 294, 298–99 (S.D.N.Y. 1997), *aff'd*, 132 F.3d 145 (2d Cir. 1998).

Defendants argue that Plaintiff has not sustained the burden of showing that he was "otherwise qualified" for the position of Train Operator, "because he did not get far enough in the hiring process for the Transit Authority to review his criminal history." (Defs.' Mem. 10.)[18] Defendants, in other words, ask me to assume that Plaintiff might not have passed a criminal background check qualifying him for the job simply based on the fact that Plaintiff was not actually given the opportunity to reach that stage of the hiring process. I find this line of reasoning unpersuasive.

As an initial matter, it is not clear how an applicant's criminal history or lack thereof impacts the "essential functions" of the Train Operator position. *Hogarth*, 833 F. Supp. at 1086. There is good reason for subjecting the "otherwise qualified" analysis to an "essential functions" requirement: without this narrowing criterion, a plaintiff alleging disability discrimination would be required to show that he or she met each and every of the job's entry requirements in general. This would effectively place a burden on plaintiffs who were unfairly denied opportunities to undergo certain hiring formalities to show that they would indeed have cleared those formalities. Defendants do not cite any cases, point to any policy directives, or raise any arguments supporting a theory that an applicant's criminal record would inextricably impact his or her

---

[18] The screening process is outlined in Plaintiff's letter of employment as follows: "Upon successful completion of the medical evaluation, consistent with applicable laws, any criminal conviction(s) record will be reviewed." (Hechtkopf Decl. Ex. 18, Mar. 29, 2017 Letter.)

ability to perform the essential functions of the Train Operator job.[19]  While an existing medical condition or a risk of remission may bear upon a candidate's present ability to work, it strains credulity to suggest in the context of criminal history that past facts inexorably dictate a candidate's present disposition or his or her ability to engage in the functions of a job.

Nor do Defendants even suggest that, in this scenario, Plaintiff's criminal history would have actually disqualified him from performing the essential functions of the position.  They simply speculate that Plaintiff would not have passed the very last screening stage that he alleges Defendants improperly denied him the opportunity to reach.  If the Transit Authority had a policy prohibiting individuals with criminal records from becoming Train Operators, Defendants undoubtedly would have produced evidence to support its existence rather than resort to speculation.  To the contrary, here, the fact that the Notice of Examination for the position included in its list of "requirements to be appointed" a medical requirement, a drug screening requirement, an English language requirement, as well as proof of identity and right to obtain employment in the United States, but did not similarly enumerate a criminal background check

---

[19] The Notice of Examination for the position contains the following description of the job:

> Train Operators, under supervision, have direct responsibility for the safe, timely and proper operation of New York City Transit Authority multi-unit subway cars, subway service cars and trains in accordance with the rules, regulations and special instructions governing such operation. They operate trains in revenue and non-revenue road service, and in yard or terminal service; prepare trains for road service and switch cars in yards; in revenue road service, convey passengers over assigned routes; may open and close doors in stations and terminals; may make announcements; in non-revenue road service, operate work trains and revenue collection trains; in yards and terminal service, switch cars, prepare trains for road service and operate trains between yards and terminals; convey trains into barns and shops for inspection and repair, and through car washes for cleaning; wear a prescribed uniform; and perform related work.

> Some of the physical activities performed by Train Operators and environmental conditions experienced are: climbing and descending ladders on and off the tracks, ascending and descending from trains and catwalks to roadbeds; walking along elevated sections of track; responding to audible signals such as alarm bells, train whistles, horns and radio conversation; responding to visual signals including distinguishing colored lights; using manual equipment related to train operation; remaining in a sitting position for extended periods of time; and lifting heavy equipment.

(Hechtkopf Decl. Ex. 13, Notice of Examination No. 8098, at 1.)

requirement militates against a finding that the latter is essential to the job.  (Hechtkopf Decl. Ex. 13, Notice of Examination No. 8098, at 2.)  Furthermore, Plaintiff disclosed his previous arrests and criminal history to Defendants as part of his job application.  (*See* Defs.' 56.1 ¶ 105; Pl. Dep. Tr. 25:3-15; *see also* Hechtkopf Decl. Ex. 22-I at 20–22 (letter from Manhattan II Parole Office regarding Plaintiff's toxicology reports enclosed in Plaintiff's medical file).)  The fact that this disclosure did not doom Plaintiff's efforts to become a Train Operator or cause a hold in the hiring process in the way that his disclosure of his drug history and renal health did supports an inference that an applicant's criminal history does not impact the "essential functions" of a Train Operator.  Absent a policy mandating that a clean record is a requirement for the role of Train Operator, I decline to hold that past criminal activity renders a candidate incapable of performing the essential functions of a Train Operator position.

Here, the record indicates that Plaintiff indeed possessed "the basic skills necessary for the performance of [the Train Operator] job."  *Makinen*, 53 F. Supp. 3d at 693.  Plaintiff passed the initial open competitive examination, which placed him on a list of eligible hires for the Train Operator position.  Dr. Akiwumi cleared Plaintiff's medical hold and issued Plaintiff a medical qualification slip.  (Defs.' 56.1 ¶ 87; Am. Compl. ¶ 43; Hechtkopf Decl. Ex. 28, Medical Qualification Slip.)  Therefore, Plaintiff's passing of the requisite medical clearance demonstrates that his kidney function and prior drug history would not have interfered with his ability to carry out the duties of a Train Operator, and therefore that he was otherwise "able to meet all of [the] program's requirements in spite of his [putative] handicap."  *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979).  I therefore find that Plaintiff has raised sufficient evidence to satisfy the second element of his *prima facie* case.

b.  <u>"Because of Disability"</u>

To allege an employment discrimination claim, a plaintiff "must show that [his or her] disability was a but-for cause of the employer's action."  *Natofsky v. City of New York*, 921 F.3d 337, 341, 348 (2d Cir. 2019) (applying the ADA's "but-for" causation standard rather than a "sole cause" standard to Rehabilitation Act claims), *cert. denied*, 140 S. Ct. 2668 (2020).  To sustain his *prima facie* burden, Plaintiff must produce "evidence that allows for a reasonable inference of discrimination."  *McDonnell v. Schindler Elevator Corp*., 618 F. App'x 697, 698 (2d Cir. 2015).  "'What this means in the summary judgment context is that the plaintiff must establish a genuine issue of material fact . . . as to whether the employer's reason for [the alleged discriminatory action] is false and as to whether it is more likely that a discriminatory reason' was the but-for cause of the adverse employment action."  *Wein v. New York City Dep't of Educ*., No. 18 Civ. 11141 (PAE), 2020 WL 4903997, at *12 (S.D.N.Y. Aug. 19, 2020) (alterations in original) (emphasis omitted) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994)).

The record makes evident that Plaintiff may have been a victim of inopportune circumstances, but not of disability discrimination.  Plaintiff has not produced evidence sufficient to create a dispute of material fact concerning the Transit Authority's proffered reason for failing to hire him or which suggests that his disability was more likely the but-for cause of their failure to hire.  There is nothing in the record that suggests that any of the Defendants were motivated by discriminatory reasons in failing to hire Plaintiff.  Plaintiff has not raised any comments reflecting discriminatory animus—let alone any opining on his drug use history—by the individual Defendants that may be imputed to the Transit Authority.  Neither has Plaintiff raised any facts suggesting that he was treated less well than other open competitive list candidates, all

24

of whom were required to go through a medical screening, due to discriminatory motive, as is required under the NYCHRL.  *See Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (summary order).

In contrast, Defendants have raised evidence—and Plaintiff does not dispute—that Defendants were required under New York's civil service rules to first exhaust the promotional list that DCAS had certified before appointing from the open competitive list that contained Plaintiff's name.  *See* N.Y. Civ. Serv. Law § 52(1).  This was made explicit in the Open Examination Notice, which stated that a promotion examination was being held for City employees and that the names appearing on the promotion list would be prioritized in filling vacancies.  (Hechtkopf Decl. Ex. 13, at 3.)  By the time that Defendants had done so, Plaintiff's list had expired, so Defendants were no longer authorized to hire from it.  *See Altman v. Suffolk Cty. Dep't of Civ. Serv.*, 165 A.D.3d 921, 922 (2d Dep't 2018) ("appointment of an individual from a constitutionally valid expired list violates [the New York State] Constitution").  As Defendants have established, and which Plaintiff has raised no evidence to refute, the Transit Authority's Human Resources analysts were not involved in and had no control over the medical evaluation aspect of pre-employee processing, and following candidates' medical qualification, they had no control over DCAS's announcement and scheduling of Notices of Examination.

Nor does Plaintiff raise evidence that discriminatory motivations led to or caused the extended medical assessments that Defendants required Plaintiff to undergo, which lengthened his hiring process.  As Dr. Louise Donikyan, Defendants' corporate designee, testified, since the drug urine test was only good for thirty days, it was not unheard of for an applicant to undergo more than one drug test at the preemployment stage, as Plaintiff did—typically when an entry class was postponed, canceled, or the previous test results expired because a candidate was

unable to come in on the date that was given for their medical evaluation.  (Donikyan Dep. Tr. 120:10-23.)  Defendants explain that a further medical hold after Plaintiff had gotten past the pre-employment stage was appropriate and necessary to confirm that Plaintiff's drug use was in remission.  As Dr. Akiwumi testified, he referred Plaintiff for further evaluation regarding his reported drug history in order to determine whether Plaintiff's previous drug use would affect his ability to safely operate a subway train carrying thousands of passengers—not because he perceived Plaintiff as "disabled."  (Defs.' 56.1 ¶ 71; Akiwumi Dep. Tr. 132:24-133:5; *see also* Defs.' Mem. 16.)  Indeed, the Transit Authority had broad discretion to impose such a requirement in light of the public importance of the Train Operator position.  *See Gajda v. Manhattan and Bronx Surface Transit Operating Auth.*, No. 03 Civ. 1642(JSR), 2003 WL 22939123, at *2 (S.D.N.Y. Dec. 12, 2003) ("the Transit Authority has an unambiguous statutory obligation to conduct its operations in 'the interests of public safety,'" and to that end, it has "broad discretion to determine the medical qualifications and standards necessary to operate its vehicles"), *aff'd*, 396 F.3d 187 (2d Cir. 2005).

Plaintiff asserts, without supporting factual detail, that Defendants were trying to thwart his hiring process and had no intention of hiring him.  (*See* Pl.'s Opp. Mem. 6–7.)[20]  Plaintiff adds that Harley could have taken other alternatives for ensuring that he was not currently abusing drugs.  (*Id.* at 9.)  While Plaintiff is correct in pointing out that Dr. Donikyan testified on behalf of the Transit Authority that physicians were not required to send pre-employment candidates who were rehabilitated drug users to the Work Life Services Program, (Donikyan Dep. Tr. 88:1-89:6), Plaintiff does not suggest how a physician's judgment to do so in order to

---

[20] "Pl.'s Opp. Mem." refers to Plaintiff's memorandum in opposition to Defendants' motion for summary judgment, filed December 16, 2020.  (Doc. 117.)

confirm their ability to work and the possibility of remission was unreasonable or improper.[21]

Ultimately, the record is devoid of evidence that Defendants harbored any discriminatory motive in subjecting Plaintiff to a medical hold, that the medical hold Plaintiff experienced was unduly lengthy, or that Defendants singled Plaintiff out for additional testing on account of his disability in order to deliberately delay, derail, or disqualify his application.  *See Natofsky*, 921 F.3d at 351 (describing plaintiff's "failure to provide evidence of [defendant's] discriminatory intent" as "fatal to [his] claims" against that defendant).  In fact, as Plaintiff himself acknowledges, as soon as Plaintiff was cleared of his medical hold, Harley told him to submit the paperwork to Human Resources and told him that he "looked forward to riding on [Plaintiff's] train."  (Am. Compl. ¶ 42.)  This comment suggests that Harley believed that Plaintiff was still eligible for the Train Operator position, and not that he was sending Plaintiff on a fool's errand.

Although it is unfortunate that by the time Plaintiff was cleared of the medical hold, the Transit Authority was no longer able to hire from his list, Defendants' actions were neither illicit nor illegal.  They were simply acting in accordance with their duties of ensuring that Plaintiff was medically qualified and capable of safely carrying out the job.  *See, e.g.*, *Godfrey v. N.Y.C. Transit Auth.*, No. 02–cv–2101 (DLI)(RER), 2009 WL 3075207, at \*10 (E.D.N.Y. Sept. 23, 2009) (granting summary judgment dismissal of plaintiff's claim that defendant discriminated

---

[21] To the extent that Plaintiff can be deemed to be making a reasonable accommodation claim—i.e., that the Transit Authority failed to provide him with reasonable accommodation by failing to offer him an alternative to attending a state-certified drug treatment program as a prerequisite to employment—Plaintiff has not raised sufficient evidence to survive summary judgment on such a claim.  A plaintiff alleging lack of reasonable accommodation under the Rehabilitation Act bears the "burden of production to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits."  *Francis v. Runyon*, 928 F. Supp. 195, 204 (E.D.N.Y. 1996) (internal quotation marks omitted); *see also Fink*, 855 F. Supp. at 72 ("The government is not obligated under [the Rehabilitation Act] to provide plaintiff with every accommodation he may request, but only with reasonable accommodation as is necessary to enable him to perform his essential functions." (internal quotation marks omitted) (alteration in original)).  Plaintiff has not detailed any plausible alternatives that he envisioned Defendants offering, or suggested what Harley might have done other than to instruct Plaintiff to seek contemporaneous drug treatment program records, in order to confirm that Plaintiff was in remission.

against him on the basis of his hearing disability when it placed his application to be a revenue collecting agent on a 12-week medical hold, because the "attempts to assess plaintiff's hearing were job related and consistent with a business necessity because they sought to assess plaintiff's ability to safely carry out his job.").

Because Plaintiff has not raised sufficient evidence to create an issue of material fact regarding whether Defendants acted to prevent his hiring because of a perceived or actual disability, Plaintiff fails to satisfy the third element of his *prima facie* disability discrimination case. Accordingly, Defendants' motion for summary judgment as to Plaintiff's claims against the Transit Authority is GRANTED.

### C.  *NYSHRL and NYCHRL Claims Against the Individual Defendants*

#### 1.  **Applicable Law**

An individual defendant may be held liable under the NYSHRL and NYCHRL for aiding and abetting a violation of the laws "if he participates in the conduct giving rise to the discrimination claim." *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 344 (S.D.N.Y. 2009). However, "[a]n individual may not be held liable . . . merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating that law." *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 367–68 (S.D.N.Y. 2012) (internal quotation marks omitted) (alterations in original). Accordingly, an aiding and abetting claim is only viable when "an underlying violation has taken place." *See Falchenberg v. N.Y.S. Dept. of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009) (summary order); *see also Jain v. McGraw-Hill Cos., Inc.*, 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011) ("[L]iability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." (quoting *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999)), *aff'd*, 506 F. App'x 47

(2d Cir. 2012).

### 2. Application

As discussed above, Plaintiff has failed to raise evidence in support of his claims against the Transit Authority sufficient to defeat summary judgment. The record is also devoid of evidence that any of the Individual Defendants personally participated in discriminatory conduct against Plaintiff. In any case, because Plaintiff's underlying claims against the Transit Authority fail, Plaintiff's aiding and abetting claims against the Individual Defendants also fail.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's NYSHRL and NYCHRL claims against the Individual Defendants is GRANTED.

### V.   Conclusion

For the foregoing reasons, Defendants' motion for summary judgment dismissing Plaintiff's Complaint is GRANTED. The Clerk of Court is respectfully directed to terminate the open motion at Document 111 and close the case. The Clerk of Court is also respectfully directed to mail a copy of this Order & Opinion to the pro se Plaintiff.

SO ORDERED.

Dated: September 30, 2021
     New York, New York

                                    Vernon S. Broderick
                                    United States District Judge